UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA


　　　　– v –                                             Docket 20 CR 163 (PKC)


LOUIS GRASSO,

　　　　　　　　　Defendant.

_____


**MEMORANDUM OF LAW IN SUPPORT
OF PRETRIAL MOTIONS**


GLENN A. GARBER (GAG 9300)
The Woolworth Building
233 Broadway
Suite 2370
New York, N.Y. 10279
(212) 965-9370
Attorney for Defendant Dr. Louis Grasso

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………..…….……………………………………………………..   i

PRELIMINARY STATEMENT…….…………………………………………………………..   1

ARGUMENT……………………………………………………………………………….…...   2

Point I
THE FELONY INTENT TO DEFRAUD CHARGE SHOULD BE DISMISSED
BECAUSE THE OBJECT OF THE ALLEGED FRAUD IS OUTSIDE THE SCOPE OF
21 USC § 333(a)(2) AND GRASSO WAS NOT GIVEN FAIR NOTICE OF THE
ALLEGED FELONIOUS CONDUCT………………………………………………………   2

    A.  Introduction……………………………………………………………………………   2

    B.  Authority to Dismiss the Felony Charge …………........................................   3

    C.  21 U.S.C. § 333(a)(2) and the FDCA…………………………………………   5

Point II
THE FRUIT OF THE GRASSO WIRETAPS SHOULD BE SUPPRESSED BECAUSE
THE APPLICATIONS LACKED PROBABLE CAUSE, RESTED ON MATERIAL
MISREPRESENTATIONS AND OMISSIONS, WERE IN PURSUIT OF AN
INELIGIBLE WIRETAP OFFENSE, AND WERE UNECCESARY…………………….   13

    A.  Introduction…………………………………………………………………………   13

    B.  Background…………………………………………………………………………   13

        1.  September 11th Application……………………………………………………..   14

            a.  The investigation……………………………………………………………...   14

                i.   June 21, 2019, call……………………………………………..........   14

                ii.  June 28, 2019, package…………………………………………….   14

                iii. July 22, 2019, call, July 25, 2019, package, and July 28, 2019,
                    text messages………………………………………………   15

            b.  Target Offenses…………………………………………………………   17

            c.  Necessity……………………………………………………………...   17

    C.  General Legal Principles……………………………………………………   18

D. Lack of Probable Cause and Material Misrepresentations and Omissions…… 19

    1. June 21 call………………………………………………………… 21

    2. June 28 package…………………………………………………………

    3. July 22 call, July 25 package, and July 28 texts……………………… 22

E. Suppression is Warranted Because the Grasso Wiretap Application was not Focused on an Eligible Predicate Offense and the Government Failed to Demonstrate Necessity……………………………………………………. 25

Point III
THE COURT SHOULD SUPPRESS THE DERIVATIVE FRUITS OF THE
WIRETAPS……………………………………………………………….. 30

Point IV
THE COURT SHOULD DIRECT THE GOVERNMENT TO PROVIDE
ADDITIONAL DISCOVERY INCLUDING EXCULPATORY AND
IMPEACHMENT MATERIAL……………………………………………............ 31

Point V
THIS COURT SHOULD ISSUE AN ORDER DIRECTING THE GOVERNMENT TO
DISCLOSE "BAD ACT" OR "OTHER CRIMES" EVIDENCE IN ADVANCE OF
TRIAL…………………………………………………………………….. 33

Point VI
THIS COURT SHOULD ISSUE AN ORDER GRANTING LEAVE TO DEFENDANT
TO FILE ADDITIONAL AND SUPPLEMENTAL MOTIONS AND TO JOIN IN THE
MOTIONS OF CODEFENDANTS …………………………………………… 35

CONCLUSION…………………………………………………………… 35

# TABLE OF AUTHORITIES

**CASES**

*United States v. Aleynikov,* 676 F.3d 71 (2d Cir. 2012)…………………………….…..  3

*Aliano v. Westchester Racing Ass'n,* 265 A.D. 225 (2d Dept. 1942)…………………..  11

*Berger v. New York,* 388 U.S. 41 (1967)…………………………………………….…  18

*Bouie v. City of Columbia,* 378 U.S. 347 (1964)…..,………………………………….  4

*Brady v. Maryland*  373 U.S. 83 (1963)………………………………………………..  32, 33

*United States v. Concepcion,* 579 F.3d 214, 218 (2d Cir. 2015)………………………  29

*Dalia v. United States,* 441 U.S. 238 (1979)………………………………………….  25

*Dowling v. United States*, 473 U.S. 207 (1985)……………………………………..  3

*Franks v. Delaware*, 438 U.S. 154 (1978)……………………………………………  20, 25

*Gelbard v. United States,* 408 U.S. 41 (1972)………………………………………..  18

*Giglio v. United States*, 405 U.S. 150 (1972)………………………………………..  32

*Illinois v. Gates,* 462 U.S. 213 (1983)………………………………………………..  19, 28

*Kyles v. Whitley,* 514 U.S. 419 (1995)……………………………………………….  33

*Lanzetta v. State of N.J.*, 306 U.S. 451 (1939)………………………………………..  4

*Masciarelli,* 558 F.2d 1067 (2d Cir. 1977)…………………………………………..  26

*McBoyle v. United States,* 283 U.S. 25 (1931)………………………………………..  4

*Murray v. United States,* 487 U.S. 533 (1988)………………………………………..  30

*Napue v. Illinois*, 360 U.S. 264 (1959)………………………………………………..  32

*Rewis v.United States,* 401 U.S. 808 (1971)…………………………………………...  4

*Rivera v. United States,* 728 F.Supp. 250 (S.D.N.Y. 1990)………………………….  21, 22

*Rivera v. United States,* 928 F.2d 592 (2d Cir. 1991)……………………………………….. 21

*United States v. Agurs*, 427 U.S. 97 (1976)…………………………………………………… 32

*United States v. Awadallah,* 349 F.3d 42 (2d Cir. 2003)……………………………… 20, 21

*United States v. Bagley*, 473 U.S. 667 (1985)…………………………………………………. 32

*United States v. Bailleaux*, 685 F.2d 1105 (9th Cir. 1982)…………………………… 34

*United States v. Ballistrea,* 101 F.3d 827 (2d Cir. 1996)……………………………… 8

*United States v. Bass,* 404 U.S. 336 (1971)…………………………………………………. 4

*United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978)……………………………… 34

*United States v. Binday,* 804 F.3d 558 (2d Cir. 2015)………………………………… 27

*United States v. Brodson,* 528  F.2d 214 (7th Cir. 1975)……………………………… 28

*United States v. Canfield,* 212 F.3d 713 (2d Cir. 2000)……………………………… 20

*United States v. Dessart*, 829 F.3d 395 (7th Cir. 2016)………………………………… 9

*United States v. Ellis,* 326 f.3d 550 (4th Cir. 2003)…………………………………… 9

*United  States v. Falso,* 544 F.3d 110 (2d Cir. 2008)…………………………………… 20

*United States v. Giordano,* 416 U.S. 505 (1974)…………………………………………… 19, 28

*United States v. Haga*, 821 F.2d 1036 (5th Cir. 1987)……………………………… 8

*United States v. Herbert*, 762 F.App'x 182 (5th Cir. 2019)…………………………… 12

*United States v. Lanier,* 520 U.S. 259 (1997)………………………………………………… 4

*United States v. Leon,* 468 U.S. 897 (1984)……………………………………………… 20

*United  States v. Levine,* 690 F.Supp. 1165 (E.D.N.Y. 1988)…………………………… 26

*United States v. Levy,* 11-Cr-62 (PAC), 2012 WL 5830631, at \*5 (S.D.N.Y. Nov. 16, 2012)……………………………………………………………………………………………….. 20

*United States v. Lexington Mill Co.,* 232 U.S. 399 (1914)…………………………… 5

*United States* v. *Marion,* 535 F.2d 697 (2d Cir. 1976)…………………………..  18, 28

*United States v. Mehrmanesh*, 689 F.2d 822 (9th Cir. 1982)…………………….  34

*United States v. Milstein,* 401 F.3d 53 (2d Cir. 2005)………………………….  6, 7, 8

*United States v. Mitcheltree,* 940 F.2d 1329 (10th Cir. 1991)………………….  *Passim*

*United States v. Myers*, 550 F.2d 1036 (5th Cir. 1977)………………………….  34

*United States v. Navarro,* 20-cr-160(MKV), DE 450 (July 30, 2021)………………  *Passim*

*United States v. Nejad,* 436 F.Supp.3d 707 (S.D.N.Y. 2020)………………………  21

*United States v. Pirro,* 212 F.3d 86 (2d Cir. 1991)…………………………………  3

*United States v. Pollack*, 534 F.2d 964 (D.C. Cir.)…………………………………  32

*United States v. Rajaratnam,*  09-Cr-1184 (RJH), 2010 WL 3219333, at *2 (S.D.N.Y. Aug. 12, 2010)……………………………………………………………………  18, 25

*United States v. Rajaratnam,* 719 F.3d 139 (2d Cir. 2013)………………………  20, 21

*United  States v. Raymonda,* 780 F.3d 105 (2d Cir. 2015)………………………  20

*United States v. Rojas,* 841 F.App'x 449 (3rd Cir. 2021)………………………  12

*United States v. Stavroulakis,* 952 F.2d 686 (2d Cir. 1992)    4

*United States v. Velastegui*, 199 F.3d 590 (2d Cir. 1999)………………………  4

*Wong Sun v. United States*, 371 U.S. 471 (1963)……………………………………  25, 30

## STATUTES AND CONSTITUTIONAL PROVISIONS

15 U.S.C. § 3051…………………………………………………………………  5

18 U.S.C. § 2510…………………………………………………………………  18

18 U.S.C. § 2515…………………………………………………………………  19

18 U.S.C. § 2516…………………………………………………………………  18, 25

18 U.S.C. § 2517…………………………………………………………………  18

18 U.S.C. § 2518……………………………………………………………… *Passim*

18 U.S.C. § 3500………………………………………………………………… 31

21 U.S.C. § 330(a)(2)……………………………………………………… *Passim*

21 U.S.C. 333(a)………………………………………………………………… 5, 6

9 N.Y.C.C.R. §§ 4000-4082.3…………………………………………… 11

9 N.Y.C.R.R. § 4043.4………………………………………………….. *Passim*

Food Drug and Cosmetic Act of 1938 (FDCA)………… ……………………… 5

Pure Food and Drug Act of 1906 (PFDA)………………………………………….. 5

Fed. R. Evid. 403………………………………………………………………… 34

Horseracing Integrity and Safety Act of 2020 (HISA)………………………………… 5

Jencks Act………………………………………………………………………… 31

N.J. Admin. Code § 13:70-14A1(b)……………………………………………….. 12

N.J.A.C. § 13:71…………………………………………………………………… 10

N.J.S.A. §§ 5:5………………………………………………………………….. 11

N.Y. Const., Art. 1, § 9……………………………………………………………. 11

Rule 12(b)(3), Fed.R.Crim.P………………………………….................... 3

Rule 404, Fed.REvid………………………….......…………………………. 2, 33

Rule 5, Fed.R.Cr.P ……………………………………………………………….. 33

Rule 7(c), Fed. R. Crim. P.…............................................................... 3

**OTHER AUTHORITIES**

*Deep within Relief Bill Horse Racing Gets New Tools to Clean Up,* Joe Drape, New York Times, 12/29/20. www.nytimes.com/2020/12/29/sports/horse-racing/horse-racing-dopung-usda.html ……………………………………………………… 5

Federal Trade Commission (FTC) www.ftc.gov/enforcement/anticompetitive-practices ................................................................................................................. 6

The Division of the New Jersey Racing Commission https://www.njoag.gov/about/divisions-and-offices/nj-racing-commission-home/about-njrc/ ............................................................................................................. 11

www.merriam-webster.com/dictionary/pari-mutuel................................................. 11

## PRELIMINARY STATEMENT

The government's case is ill-conceived.

In its overzealous effort to clean up the horse racing industry, the government essentially seeks to criminalize conduct that, if true, is at most worthy of civil sanctions.  Drawing from a statute that was not designed or intended to punish the alleged conduct, it exploits buzz words in the indictment, like "doping" and "Performance Enhancing Drugs" (PEDs) for shock value. The theory of prosecution seems to be that if horse trainers administer substances to horses too close in time to a race in violation of state racing commission regulations, even if the substances are therapeutic and allowable by the Food and Drug Administration, it's a crime.  And because the criminal misbranding and adulteration provisions of the Federal Food, Drug, and Cosmetic Act are broadly worded, this conduct is punishable as a crime, despite the fact that it is well beyond the intended purpose of the Act, which is to protect consumers.  This overreaching is unfair and unjust.

What substances can be given to racing horses and when is technical and nuanced. Moreover, as a veterinarian, and not a trainer, Dr. Grasso is not tasked with when to administer drugs to horse in compliance with racing regulations and is therefore removed from the alleged criminal conduct. Essentially, the indictment scapegoats him, who at worst did the same things that others similarly situated did and continue to do, and which are not clearly proscribed under the criminal law.

The government also invaded the privacy of Dr. Grasso through an illegal wiretap, and unreasonably searched his premises in violation of the Fourth Amendment.

Dr. Grasso submits this memorandum of law in support of his pretrial motions seeking (1) dismissal of the felony intent to defraud charge in the indictment; (2) suppression of wiretap

evidence; (3) suppression of the fruits of a search warrant; (3) Discovery and *Brady* material; (5) disclosure of Rule 404(b) evidence; (6) leave to file additional and supplemental motions and to join the motions of codefendants; and for other consistent relief this Court deems to be just.

The underlying facts for this memorandum of law are contained in the Declaration of counsel, the accompanying exhibits, and are discussed herein.

## ARGUMENT

### Point I

**THE FELONY INTENT TO DEFRAUD CHARGE SHOULD BE DISMISSED BECAUSE THE OBJECT OF THE ALLEGED FRAUD IS OUTSIDE THE SCOPE OF 21 USC § 333(a)(2) AND GRASSO WAS NOT GIVEN FAIR NOTICE OF THE ALLEGED FELONIOUS CONDUCT**

**A.      Introduction**

The Federal Food, Drug, and Cosmetic Act of 1938 was enacted to protect consumers against unscrupulous manufacturers and distributors of drugs and cosmetics. The misbranding and adulteration provisions in the Act were designed to punish those who misrepresent the contents of drugs and cosmetics for public consumption. The indictment in this case is defective because the felony intent to defraud charge fails to allege that Dr. Grasso acted to defraud a consumer – which the Act was aimed at protecting – or the Food and Drug Administration (FDA) or a similar government agency charged with protecting consumers. Instead, it merely identifies "government agencies" in general, "including" unspecified "federal and state drug regulators." Ind. ¶ 4. These references are too vague to adequately notify Grasso of the objects of the alleged fraud. Mention in the indictment of "various state horse racing regulators and the betting public" as intended victims does not salvage the felony charge. *Id.* The betting public is not a consumer under the FDCA, and in any event the indictment does not effectively allege that

the betting public was harmed or how it could be by the alleged conduct. And state racing horse authorities are markedly different than the FDA or a consumer protection agency and thus fall outside the ambit of the intent to defraud statute.  Consequently, the felony fraud charge under § 333(a)(2) should be dismissed.[1]

### B.   Authority to Dismiss the Felony Charge

Rule 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure authorizes the dismissal of an indictment where it "fail[s] to state an offense." "[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov,* 676 F.3d 71, 75-76 (2d Cir. 2012).  "Federal crimes… are solely creatures of statute." When interpreting a criminal statute, "it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Dowling v. United States*, 473 U.S. 207, 214 (1985).

For sure, every criminal defendant is entitled to fair notice of the charges against him or her.  "Criminal prosecutions... must rest on a violation of a clear rule of law.... If defendants… could not have ascertained the legal standards applicable to their conduct [,] criminal proceedings may not be used to define and punish an alleged failure to conform to those standards."  *United States v. Pirro,* 212 F.3d 86 (2d Cir. 1991).

Rule 12(b)(3)(B)(iii) authorizes the dismissal of an indictment where there is a "lack of specificity." Fed. R. Crim. P. 12(b)(3)(B)(iii). Relatedly, Rule 7(c) requires an indictment to convey "a plain concise and definite written statement of these essential facts constituting the

---

[1] A similar challenge to the indictment was made and rejected in *United States v. Navarro,* 20-cr-160(MKV), DE 450 (July 30, 2021).  However, *Navarro* was wrongly decided as discussed herein.  That case is still pending, the Second Circuit has not yet weighed in on the matter, and this Court is certainly not bound by the erroneous ruling in *Navarro.*

offense charged." Fed. R. Crim. P. 7(c). It must contain sufficient detail to advise the defendant of the charges and enable an assertion of "double jeopardy in a future prosecution based on the same set of events." *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir. 1992).

Justice Oliver Wendell Holmes cautioned that when a legislature enacts a crime, "it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle v. United States,* 283 U.S. 25, 27 (1931); *Bouie v. City of Columbia,* 378 U.S. 347, 350–51 (1964)(due process demands that a statute "give fair warning of the conduct that makes it a crime."). The doctrinal rule of lenity was created to err on the side of defendants' rights. *See United States v. Bass,* 404 U.S. 336, 348 (1971). It "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *United States v. Lanier,* 520 U.S. 259, 266 (1997). If it is found that "the ambit of the criminal statute is ambiguous, the ambiguity should be resolved in favor of lenity." *United States v. Velastegui,* 199 F.3d 590, 593 (2d Cir. 1999); *see also Rewis v.United States,* 401 U.S. 808, 812 (1971). Indeed, "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Lanzetta v. State of N.J.*, 306 U.S. 451 (1939).

Unfortunately, these precepts, which require alleged conduct to be within the scope of a criminal statute and the basic right to fair notice of criminal charges in accordance with due process of law, were violated in this case.

## C.      21 U.S.C. § 333(a)(2) and the FDCA

The intent to defraud felony provision of 21 U.S.C. 333(a)(2) is limited to punishing the intent to defraud consumers and consumer protection agencies.[2]

The Food, Drug, and Cosmetic Act of 1938 (FDCA) stems from the Pure Food and Drug Act of 1906 (PFDA).  Both acts, by their nature, are consumer protection acts. As to the PFDA,

> The statute upon its face shows, that the primary purpose of Congress was to prevent injury to the public health by the sale and transportation in interstate commerce of misbranded and adulterated foods. The legislation, as against misbranding, intended to make it possible that the consumer should know that an article purchased was what it purported to be; that it might be bought for what it really was and not under misrepresentations as to character and quality.  As against adulteration, the statute was intended to protect the public from possible injury by adding to articles of food consumption poisonous and deleterious substances which might render such articles injurious to the health of consumers.

*United States v. Lexington Mill Co.,* 232 U.S. 399, 409 (1914).  The FDCA, which was built off of the PFDA and added cosmetics was, likewise, designed to protect consumers. Neither act makes any mention of protecting horses or regulating horseracing. Nor is there anything in the legislative history of either act to suggest Congress ever contemplated regulating horseracing. Indeed, the recent enactment of the Horseracing Integrity and Safety Act of 2020 (HISA), which came about after the indictment in this case, marks the first time Congress sought to address and federalize "horse-doping." 15 U.S.C. § 3051 *et seq*.; *Deep within Relief Bill Horse Racing Gets New Tools to Clean Up,* Joe Drape, New York Times, 12/29/20,

---

[2] There is a distinction between the misdemeanor and felony provisions in § 333(a)(1) and (2), both of which Dr. Grasso is charged with violating. § 333(a)(1), the misdemeanor, is a strict liability crime that does not require intent.  That is, any misbranding or adulteration, even without the purpose of harming another, is still a crime.  Thus, a victim, let alone an identifiable victim, is not required. On the other hand, § 333(a)(2), a felony, is a specific intent crime and requires proof of the intent to defraud and a victim.

www.nytimes.com/2020/12/29/sports/horse-racing/horse-racing-dopung-usda.html.

     The HISA delegates oversight to the Federal Trade Commission (FTC).  Notably, the FTC monitors unfair competition, as opposed to makers, distributers and consumers of drugs, which the FDCA covers.  www.ftc.gov/enforcement/anticompetitive-practices.  The HISA does not mention the FDCA or otherwise indicate that it supplements or seeks to improve any provisions in it to regulate horseracing more effectively.

     Further suggesting that horse-doping was not covered by prior legislation, the HISA created the "Horseracing Integrity and Safety Authority" and an "Anti-doping and Medication Control Program" to be developed by the Authority. HISA §§ 1203 and 1206. When "developing" the "program, the Authority shall take into consideration:"

(1) Covered horses should compete only when they are free from the influence of medications, other foreign substances, and methods that affect their performance.

(2) Covered horses that are injured or unsound should not train or participate in covered races, and the use of medications, other foreign substances, and treatment methods that mask or deaden pain in order to allow injured or unsound horses to train or race should be prohibited.

(3) Rules, standards, procedures, and protocols regulating medication and treatment methods for covered horses and covered races should be uniform and uniformly administered nationally.

(4) To the extent consistent with this Act, consideration should be given to international anti- doping and medication control standards of the International Federation of Horseracing Authorities and the Principles of Veterinary Medical Ethics of the American Veterinary Medical Association.

(5) The administration of medications and treatment methods to covered horses should be based upon an examination and diagnosis that identifies an issue requiring treatment for which the medication or method represents an appropriate component of treatment.

(6) The amount of therapeutic medication that a covered horse receives should be the minimum necessary to address the diagnosed health concerns identified during the examination and diagnostic process.

(7) The welfare of covered horses, the integrity of the sport, and the confidence of the betting public require full disclosure to regulatory authorities regarding the administration of medications and treatments to covered horses.

Obviously, the fact that Congress established an Authority to "consider" and "develop" these areas of concern for incorporation into the Program show that they require study and deliberation before specific rules and regulations can be devised to police them fairly and effectively.  It also demonstrates that even though the government tries to pigeon-hole the alleged proscribed conduct here into an old statute not designed to address the underlying concerns, what is right or wrong as far as "doping" in the world of horseracing is far from clear. Notably, the HISA provides for civil penalties and does not criminalize racehorse violations or "doping."

Unsurprisingly, the use of 21 U.S.C. § 333 to prosecute misbranding or adulteration of drugs used on racehorses is a rare and relatively recent phenomenon.  Thus, the reach and propriety of § 333 as a prosecutorial tool against doping in horseracing, and especially the felony intent to defraud provision, has not been thoroughly treated by the courts, and it is murky. What is clear however, is that there are limits on who can be harmed under § 333(a)(2), and that the victim must be consumers or government agencies that protect consumers.

In *United States v. Milstein,* 401 F.3d 53 (2d Cir. 2005), the Second Circuit adopted the reasoning of the Tenth Circuit in *United States v. Mitcheltree,* 940 F.2d 1329 (10th Cir. 1991), and found that the victims of fraud under the FDCA, had to be the consuming public or government agencies that protect consumers, such as the FDA.  It stated: "By misleading governmental agencies, and 'thereby frustrating their efforts to protect the public,' Milstein 'indirectly misled and defrauded the public,' thus contravening the overriding 'congressional purpose [of] consumer protection' embodied" in § 333(a)(2) and another provision of the FDCA.

*Milstein,* at 69, quoting *Mitcheltree,* at 1348 (brackets in original). The language *Milstein* draws

from *Mitcheltree* actually comes from *United States v. Bradshaw*, 840 F.2d 871 (11th Cir. 1988),

also cited approvingly by the Second Circuit.[3] The full quote is:

> The general scheme of the Act and its legislative history indicate the overriding
> congressional purpose was consumer protection – protection of the public against
> any misbranded or adulterated food, drug, devise, or cosmetic. When Bradshaw
> misled governmental agencies, thereby frustrating their efforts to protect the
> public, he indirectly misled and defrauded the public.

*Bradshaw,* at 874; *Milstein,* at 69, citing *Bradshaw,* at 874.

In addition, when the victim of the fraud under § 333(a)(2) is a consumer protection

agency, the entity must be identified. In *Mitcheltree,* the Court rejected the farther-reaching

notion propounded in *United States v. Haga*, 821 F.2d 1036, 1043 (5th Cir. 1987), that a

governmental agency may never be a victim under the FDCA. But in doing so and also leaning

on the fact that § 333(a)(2) has a specific intent requirement, it held that "if the government

proceeds on this theory [that the FDA and Florida drug authorities were defrauded], there must

be a demonstrated link between the § 331 violation and intent to mislead or defraud an

*identifiable* drug regulatory agency involved in consumer protection. Distributing drugs in

knowing violation of federal and state regulatory systems and rules is too general." *Mitcheltree,*

at 1349 (italics in original)(internal cites omitted); *see also United States v. Ballistrea,* 101 F.3d

827, 833 (2d Cir. 1996)(acknowledging that cases treating the specific intent requirement under

§ 333(a)(2) demands a narrow construction and proof of "actual contact between the defendant

---

[3] Based on *Milstein,* the Court in *Navarro* did not embrace the government's argument that the general "intent to defraud" language in § 333(a)(2) made the field of potential victims under the statute limitless. "[T]he very fact that the Second Circuit analyzed whether the FDA falls within the reach of the felony provision in FDCA cases suggests that there may be some limitation." DE 450, at 15, citing *Milstein,* at 69-70.  The Court in *Navarro* nevertheless found that the indictment there sufficiently alleged that the FDA was a victim along with others that were within the scope of the felony statute.

and [the] Government agency or its officials" alleged to be defrauded.); *United States v. Dessart*, 829 F.3d 395, 403 (7th Cir. 2016)(under § 333(a)(2) government must allege and prove defendant intended to defraud "either consumers or the FDA or both."); *United States v. Ellis,* 326 f.3d 550, 554 (4th Cir. 2003)("inquiry… is whether the defendant designed his conduct to avoid the regulatory scrutiny of the FDA.").

Here, the indictment does not adequately identify the victim of the fraud.  It merely states:

> To avoid detection of their administration of misbranded and adulterated PEDs to racehorses, also known as "doping," the scheme participants routinely defrauded and misled government agencies, including federal and state drug regulators, various state horse racing regulators, and the betting public.

Ind. ¶ 4.  As to "federal and state drug regulators," there is no indication in the felony fraud section of the indictment where the victims are discussed of what the regulating agencies are.

Certainly, there are a host of different agencies that the indictment can be referring to.  For instance, the Drug Enforcement Agency, the Department of Health and Human Services, the Center of Medicare and Medicaid-Services, the Center for Disease Control and Prevention, Customs and Border Patrol, the Federal Drug Administration, among others, could potentially constitute "federal drug regulators." As to "state drug regulators," the indictment alleges that illegal conduct occurred in New York and New Jersey, and each state has various agencies that could be construed as drug regulators.[4]  In any event, even if one could land on a state or federal drug consumer protection agency, which is impossible from a reading of the indictment, there

---

[4] For example, New York has the Bureau of Narcotic Enforcement, the state police, and various law enforcement agencies and task forces that regulate and police drugs.  And, in New Jersey there are the Department of Health, the Consumer Affairs Division, the state police and law enforcement drug units.

are no allegations in the indictment for the defendants to know how they were defrauded.[5]

The "betting public" suffers a similar fate.  Horses, not the "betting public," are the consumers of the alleged misbranded or adulterated substances. Thus, in a "horse-doping" case like this it is too much of a stretch to extend the consumer protections under the FDCA to gamblers who are not the consumers of the alleged PEDs. Furthermore, nothing in the indictment suggests that the betting public was harmed or intended to be harmed by the alleged scheme to defraud.

As to racehorses, they are not identified as victims in the intent to defraud provision of the indictment. But notwithstanding this void, horses cannot be defrauded. If anything, it would be the trainers who bare a special responsibility to protect their horses. 9 N.Y.C.R.R. § 4043.4 (directing that a trainer be responsible "at all times" for the condition of their horses); N.J.A.C. § 13:71-23.6 (referring to trainers as "absolute insurer of" and "responsible for the condition of" any "horse within his care and custody").  However, they too are not identified as victims in the fraud provision.  Even if the trainers were, the indictment places them in the alleged scheme and thus they cannot be the intended targets of the fraud.

Indeed, the only potential victim that warrants much discussion is "state horse racing regulators."  The fraud provision of the indictment does name them. However, unlike the FDA, they are not consumer protection agencies, as they must be under the FDCA. *See Mitcheltree*, at 1349.

The New York Gaming Commission regulates horseracing through its Division of Horse

---

[5] The Court in *Navarro* essentially found that the FDA had to be the intended fraud victim because it is the policing agency for the FDCA. *Navarro,* DE 450, 16-18. However, given the lack of clarity in the indictment in that case (and here) that the FDA was the object of harm in the intent to defraud provision, the determination is flawed. This is especially so considering the plethora of federal agencies it can also be, a point the *Navarro* decision did not address.

Racing and Pari-Mutuel Wagering. 9 N.Y.C.C.R. §§ 4000-4082.3.[6] "The racing commission is the administrative agent for the collection and distribution" of monies "essential to the proper conduct of [the] system of betting." *Aliano v. Westchester Racing Ass'n,* 265 A.D. 225, 228-29 (2d Dept. 1942). The Commission also regulates bingo, casinos, raffles, fantasy sports, and other wagering games.

Similarly, the New Jersey Racing Commission regulates pari-mutuel wagering and horseracing. N.J.S.A. §§ 5:5-22 and 13:70-1 *et. seq.* It "is responsible for regulating the safety and integrity of the horse racing industry through the conduct of investigations, prosecutions [] via regular monitoring. The Division of the New Jersey Racing Commission has jurisdiction over New Jersey thoroughbred and standardbred permit holders and the authority to regulate racing at the state's three racetracks." https://www.njoag.gov/about/divisions-and-offices/nj-racing-commission-home/about-njrc/. The Commission also oversees races, "supervises the extraction of fluid and blood specimens from horses for chemical analysis… [and] ensure[s] that no illegal or banned substances are being used." *Id.*[7]

The core function of both commissions is to police wagering and fair competition. They certainly are not concerned with protecting human consumers from the deleterious effect of drugs.  Although the commissions deal with drugs, the function is peculiar to the horseracing industry and has nothing to do with consumer protection.  Rather, they test for drugs in horses and jockeys and primarily address when a drug can be administered in relation to a race. For

---

[6] Para-mutuel betting is "a betting pool in which those who bet on competitors finishing in the first three places share the total amount bet minus a percentage for the management." www.merriam-webster.com/dictionary/pari-mutuel.

[7] The New York Gaming and New Jersey Racing commissions are also tasked with collecting state taxes.  N.Y. Const., Art. 1, § 9; 9 N.Y.C.C.R. § 4009.27; N.J.S.A § 5:5-68.

horses, it varies depending on the type of drug. *See* 9 N.Y.C.C.R. § 4043.2(c)-(g); N.J.S.A. § 13:70-14A1(b).  Indeed, many of the drugs that are not permitted in horseracing are FDA-approved animal drugs and cannot be used near race time, even if therapeutic or medically necessary to treatment by a licensed veterinarian. 9 N.Y.C.C.R. § 4043.2(c)(1)-(8)(includes vitamins and food supplements); N.J. Admin. Code § 13:70-14A1(b)(includes anti-inflammatories).[8]

The New York and New Jersey horse racing commissions take starkly different approaches to drugs.  And, unlike the FDA, the commissions do not approve drugs, monitor drug permitholders, address drug labeling, or concern themselves with drug safety for consumers. Even if horses can be deemed consumers, only the FDA approves new animal drugs and regulates the supply chain. So, if horse safety vis-a-vis drugs is the touchstone, it is the FDA, not the commissions that control.

State racing commissions simply cannot be construed as consumer protection agencies.

In sum, it is simply unfair to conclude that conduct alleged in the indictment is punishable as a felony under 21 U.S.C. § 330(a)(2) or that Grasso was given fair notice of the offense. As such, the felony charge in the indictment should be dismissed.

---

[8] Recently, in *United States v. Rojas,* 841 F.App'x 449 (3rd Cir. 2021), and *United States v. Herbert*, 762 F.App'x 182 (5th Cir. 2019), § 333(a)(2) was applied to horseracing. In both cases, state racing authorities were the targeted victims of fraud, and the convictions were upheld. However, neither court was confronted with the claims here. Thus, they can have no bearing on the reach of the statute to state horseracing regulators.

## Point II

**THE FRUIT OF THE GRASSO WIRETAPS SHOULD BE SUPPRESSED BECAUSE THE APPLICATIONS LACKED PROBABLE CAUSE, RESTED ON MATERIAL MISREPRESENTATIONS AND OMISSIONS, WERE IN PURSUIT OF AN INELIGIBLE WIRETAP OFFENSE, AND WERE UNECCESARY**

### A. Introduction

The government tapped Dr. Grasso's cellphone from September 11, 2019, to November 6, 2019.  There were two underlying applications: 1) on September 11, 2019, followed by periodic reports on September 23, 2019 and October 1, 2019; and 2) a renewed application on October 10, 2019, followed by periodic reports on October 21, 2019 and October 30, 2019.  On November 7, 2019, an order issued to seal both wiretaps.

Because the initial September 11th application lacks probable cause, contains material misrepresentations and omissions, was obtained in bad faith, and was unnecessary, and since the October 10th wiretap stems from the September 11th application, all intercepted calls and texts must be suppressed.[9]

### B. Background[10]

The application in support of the initial September 11th Grasso wiretap was based on information developed from a Confidential Source (CS-7).  Aff-1, 26, 33, 58-65. It also references an analysis of toll records previously obtained. *Id*. 69-72.  However, they add little if any substance to the application, and therefore are not discussed herein.

---

[9] The key document supporting the Grasso wiretaps is the Affidavit of Timothy Bergen in Support of the wiretap on 9/11/19, "Aff-1," (EX 2).

[10] The government's investigation into "horse-doping" predated the Grasso wiretap and most of Aff-1 is dedicated to prior wiretap applications and evidence developed against Nick Surrick, Jose Navarro and others. Aff-1, 5. Dr. Grasso was not picked up on the Surrick and Navarro wiretaps, so he does not challenge those taps.

The application in support of the subsequent October 10th Grasso wiretap was based on the same underlying information and anticipated that additional communications would occur during the period of interception. Nothing in the renewed application is new except for intercepted communications from the initial tap. Because it stems from the fruit of the first illegal wiretap it must fail, and the fruits of the renewed tap must, like the fruits of the first wiretap, also be suppressed for the reasons stated below.

### 1. September 11th Application

#### a. The investigation

Aff-1 essentially relies on draft transcripts of portions of two consensually recorded calls made by CS-7 to Dr. Grasso, one text message between them, and two packages sent by Grasso to CS-7.

#### i. June 21, 2019, call

In an alleged call on June 21, 2019, CS-7 reaches out to Dr. Grasso and complains about a "stupid positive" related to one of "Al's" horses. Grasso responds, "I know… he got tangled up." Aff-1, 58. Grasso says that he heard CS-7 "want[ed] something for bleeding and breathing." In the conversation, CS-7 mentions a horse he is concerned about and that he gave "homeopatheic herbs." CS-7 said he was thinking of racing the horse in New York in "non winners or two or four." *Id.* 59. Grosso mentions the price for the "breathing stuff" and the "bleeder," he says that "[a]lmost the whole state [of Delaware] uses it… [s]o there is no problems, no positives, or nothing like that." *Id.* 60.

#### ii. June 28, 2019, package

The Affidavit goes on to describe a package ("Box-1") allegedly sent by Dr. Grasso to CS-7 in response to the June 21st call. It states "Box-1 contained (1) two clear glass bottles

containing liquid labeled 'Bronk,' 'Competitive Solutions,' and 'Dose: 5-10 c.c. --- I.B., OR I.T. 5-10. Prior to work,'" and "(2) two clear glass bottles containing liquid labelled 'Cauterize, Competitive Solutions' 'potent inhibitor of acute EIPH in horses,' 'Dose: 20cc I.V. 4-6 hr. prior to intense work,' and 'Ingredients: propriety blend of trace vitamins and minerals.'" Without showing the labels, Bergen states that the labels "did not appear to be commercially produced," followed by:

> I therefore believe that the bottles in Box-1 were the "breathing stuff" and "bleeder" that GRASSO and CS7 discuss on the call described above and that the "breathing stuff" and "bleeder" are custom-made performance enhancing substances designed to be administered shortly before a horse race and that the administration of such substances to a horse on the day of [a] race would be in violation of the New York Rules, the New Jersey Rules, the Florida Rules, and the Kentucky Rules.

Aff-1, 61-62.

Notably, the Affidavit leaves out the fact that the labels contain the following:

**Warning: all medications must be used in accordance with the rules and regulations of the racing jurisdiction of which you participate.**

EXs 3a-g.

### iii.    July 22, 2019, call, July 25, 2019, package, and July 28, 2019, text messages

In an alleged call placed on July 22, 2019, CS-7 asks about a "blood builder for horses that could be, you know… I claimed a couple racing at Yonkers and their blood has dropped." (ellipses in original). Dr. Grasso replies, "You don't want them back on Epogen, right? I mean, I got a little blood builder that I have that works pretty good." When CS-7 asks how much Epogen costs, Grasso says: "I don't know. I just give you a script and you get it. I don't handle the shit." Aff-1, 62. An agreement is then made for Grasso to send "[t]wo pain, one script, and two oral blood builders."

Then the Affidavit describes a package CS-7 allegedly receives on July 25, 2019 – "Box-2." Aff-1, 63. It explains that, as in Box-1, there is a bottle of "Bronk" and a bottle of "Cauterize," which have the same instructions on the labels about dosage and the same warnings as the bottles in Box-1. Again, the Affidavit does not mention the warnings.

In addition, in Box-2, there were two unlabeled bottles of clear liquid and two brown plastic bottles labelled "Oral Blood Builder" with instructions "5cc 3x/WK."  The markings on the labels on the brown bottles are handwritten and there are no warnings. Also included in Box-2 was a prescription for "Epogen 4000 IU Vile, # Box of 10, Sig: 1 Vile SQ Twice/WK," "written out to 'Daisy (Canine),'" and it allowed for six refills.

Then there is a July 28, 2019 text message exchange:

CS-7:        Quick Question: Oral blood builder… every other day is the way to go? 2nd …. won't test if used day before or day of? Going to try another horse at Yonkers I think this week. (punctuation in original)

GRASSO:      three times a week is good you can give it anytime you want and not test positive

Aff-1, 64.

Describing the July 22 call, the July 25 package, and the July 28 texts together, Bergen says: "blood builder… improves the physical performance of a racehorse and is either regulated or banned by applicable racing rules in Florida, New Jersey, and New York" and in these same states Epogen "may not be administered to a horse that is racing." *Id.* He therefore concludes that: 1) "Grasso is agreeing to provide CS-7 with this prescription for 'Epogen' and with other blood builders to be administered to CS-7's horses, including at Yonkers Racetrack in New York;" 2) "'oral blood builders,' 'the breather,' and the 'pain [shot]'… are custom-made performance enhancing substances designed to be administered shortly before a race" and which, if given on race day "would be a violation" of racing rules in New York, New Jersey, Florida and

16

Kentucky, and that essentially Grasso "advises CS-7" to circumvent the rules;  and that because the Epogen prescription was written for a dog, it was not "part of a valid therapeutic evidence-based treatment plan for CS-7's horses." *Id.* 64-65.

### b.  Target Offenses

In the target offense section of the Affidavit, the predicate target offenses are listed as mail fraud, wire fraud, conspiracy as to both, and money laundering. Aff-1, 9. In a footnote, it also adds misbranding of drugs under 21 U.S.C. § 352, which is acknowledged as not being a predicate wiretap offense. *Id.* (fn 13). As to all offenses collectively, the Affidavit states: "each relat[e] to a scheme to obtain, distribute, and administer various chemical substances in order to defraud racetracks, competitors, and the betting public by placing racing horses in races after secretly administering such substances to the racing horse, as described in more detail below." *Id.*

### c.  Necessity

In urging the need for the wiretap, Aff-1 addresses a litany of investigative techniques and asserts, mostly in boilerplate fashion, that they would not be successful in advancing the investigation. One section in particular warrants mention – "Confidential Informants and Cooperating Witnesses." Aff-1, 73. Here, it states that "while CS-7 has successfully made purchases of performance-enhancing substances from GRASSO, CS-7's ability to identify and contact other customers of GRASSO is limited. The confidential sources discussed above [CS-7 being the only one for Grasso], therefore, are unlikely to be in a position to develop information regarding the sources of prohibited performance-enhancing substances beyond GRASSO himself..." Aff-1, 73-74.

17

### C.  General Legal Principles

Unlike any other type of search, a wiretap allows the government to invade multiple inner sanctums – offices, cars, and, most intimately, conversations of the target subject and scores of other individuals against whom the government has no reasonable suspicion. Accordingly, the Supreme Court places a "heavier responsibility" on courts to supervise the "fairness of procedures" for obtaining wiretaps. *Berger v. New York,* 388 U.S. 41, 56 (1967). A court must independently determine that probable cause exists and that "no greater invasion of privacy was permitted than was necessary under the circumstances." *Id.* at 57.

Congress enacted Title III to establish a "comprehensive scheme for the regulation of  wiretapping and electronic surveillance." *Gelbard v. United States,* 408 U.S. 41, 46 (1972). The statute strictly "limit[s]" the use of wiretaps "to certain major types of offenses and specific categories of crime" that Congress determined necessitate covert surveillance. 18 U.S.C. § 2510 note (congressional findings); *see Gelbard,* 408 U.S. at 46 (use of wiretaps confined to investigating "specified serious crimes").

Under the terms of § 2517(5), the government can only use wiretap evidence of crimes "other than those specified" in the authorization order or in § 2516 by obtaining judicial approval "as soon as practicable." In so doing, the government must show that "'the original order was lawfully obtained, that it was sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order.'" *United States v. Rajaratnam,* 09 Cr. 1184 (RJH), 2010 WL 4867402, at *3 (S.D.N.Y. Nov. 24, 2010) (quoting *United States* v. *Marion,* 535 F.2d 697, 700 (2d Cir. 1976)).

Title III prohibits the wiretapping of conversations except in conformity with the statute's

"stringent conditions," *Gelbard,* 408 U.S. at 46, and excludes wiretapped conversations from use "in any trial, hearing, or other proceeding" if the "disclosure of that information would be in violation of this chapter," 18 U.S.C. § 2515. Title III's statutory rule of exclusion is distinct from and supplements the Fourth Amendment's own rule, and "require[s] suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano,* 416 U.S. 505, 527 (1974).

### D.  Lack of Probable Cause and Material Misrepresentations and Omissions

Even as to those crimes for which Congress authorized the use of wiretaps, Title III imposes "important preconditions to obtaining any intercept authority at all." *United States v. Giordano,* at 515. The warrant must be predicated on a finding of probable cause to believe that (i) the individual has committed or is about to commit one of the offenses specified in § 2516, (ii) communications concerning that offense will be intercepted, and (iii) the particular telephone being tapped is being used in connection with the offense. 18 U.S.C. §  2518(3). Title III mandates that law enforcement provide the authorizing court with a "full and complete statement of the facts and circumstances relied upon by the applicant" to establish probable cause. 18 U.S.C. § 2518(1)(b). The reviewing court is "required to make the same findings that are required in connection with the original order," including "that there is probable cause in the traditional sense…" *Giordano,* 416 U.S. at 530.  "[M]ere conclusory statements" are not enough.  *Illinois v. Gates,* 462 U.S. 213, 239 (1983).  Nor can a court simply "ratif[y] the conclusion of others."  *Id*.

In seeking to wiretap Dr. Grasso's cell phone, the government bore the burden of showing,

through a "full and complete statement" of the relevant facts and circumstances, probable cause

that evidence of wire fraud, mail fraud or money laundering would be found in his phone

conversations. 18 U.S.C. § 2518(1)(b). In assessing probable cause, "a judge must make a

practical common-sense decision whether, given all the circumstances set forth in the affidavit

before h[er] … there is a fair probability that contraband or evidence of a crime will be found in a

particular place." *United  States v. Raymonda,* 780 F.3d 105, 113 (2d Cir. 2015) (internal

quotation marks) (quoting *United  States v. Falso,* 544 F.3d 110, 117 (2d Cir. 2008)). Courts

"'may properly conclude that … [a]  warrant was invalid because the [district court's] probable-

cause determination reflected an  improper analysis of the totality of circumstances." *Id.*

(alterations in original) (quoting *United States v. Leon,* 468 U.S. 897, 915 (1984)).

A defendant may, "[i]n certain circumstances … challenge the truthfulness of factual

statements made in the affidavit, and thereby undermine the validity of the warrant and the

resulting search or seizure." *United States v. Awadallah,* 349 F.3d 42, 64 (2d Cir. 2003) (citing

*Franks v. Delaware*, 438 U.S. 154, 164-72 (1978)). To obtain a *Franks* hearing, a defendant

must make a "substantial  preliminary showing" that (1) the warrant affidavit included

misrepresentations or omissions that were made with a knowing or reckless disregard for the

truth; and (2) those misrepresentations or omissions were material, meaning "necessary to the

[issuing] judge's probable cause [or  necessity] finding." *United States v. Rajaratnam,* 719 F.3d

139, 146-147 (2d Cir. 2013)  (alterations in original) (quoting *United States v. Canfield,* 212

F.3d 713, 717-18 (2d Cir. 2000)).  To satisfy this test, "a defendant must 'point out specifically

the portion of the warrant affidavit that is claimed to be false.'" *United States v. Levy,* 11-Cr-62

(PAC), 2012 WL 5830631, at *5 (S.D.N.Y. Nov. 16, 2012)) (quoting *Franks,* 438 U.S. at 171).

"The reviewing court must be presented with credibly and probative evidence" that a

misstatement or omission "was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Rajaratnam,* 719 F.3d at 154 (alteration in original) (quoting *Awadallah,* 349 F.3d at 68). Reckless disregard for the truth may be established by demonstrating that an affiant made "statements which failed to take account of the facts as he knew them, or which he seriously doubted were true." *Rivera v. United States,* 728 F.Supp. 250, 258 (S.D.N.Y. 1990), *aff'd in relevant part, Rivera v. United States,* 928 F.2d 592 (2d Cir. 1991). Where omissions are concerned, courts may also consider "whether the omitted information was 'clearly critical' to the probable cause [or necessity] determination." *Rivera,* 928 F2d at 604.

"[C]ourts 'gauge materiality by a process of subtraction' or addition depending on whether misstatements or omissions are at issue." *United States v. Nejad,* 436 F.Supp.3d 707, 719 (S.D.N.Y. 2020) (quoting *Awadallah,* 349 F.3d at 65). "In other words, to determine materiality, courts should 'disregard the allegedly false statements,' 'insert the omitted truths,' and determine whether 'there remains a residue of independent and lawful information sufficient to support probable cause.'" *Id.* (citations omitted).

### 1.  June 21 call

The June 21 call hardly suggests anything nefarious, let alone criminal in nature. Dr. Grasso is a veterinarian and works with trainers, of which CS-7 presumably is one.[11] In any

---

[11] As discussed above, trainers have a special responsibility to ensure horse safety. *See, e.g.*, 9 N.Y.C.R.R. § 4043.4. They are also charged with administering substances at times that are compliant with racing regulations. *Id.* ("Every trainer must guard each horse trained by him or her in such manner and for such period of time prior to racing the horse so as to prevent any person, whether or not employed by or connected with the owner or trainer, from administering any drug or other restricted substance to such horse contrary to this Part."). Thus, there is a divide between Grasso and CS-7's conduct, with CS-7 as the ultimate wrongdoer.

event, there is nothing in the call suggesting that the substances being discussed are banned in horseracing, in fact the opposite. Trainers are always concerned that substances, even non-prohibited substances, can cause false positive tests in racehorses. That is why CS-7 talks about the "stupid positive" in the beginning of the call.  Grasso also says there won't be "positives, or anything like that" and that almost the whole state of Delaware uses it.  The implication is obviously that the breathing stuff and bleeder are not prohibited.

Nevertheless, in explaining this conversation, Bergen says, "I have learned that [sic] 'bleeder pills' or 'bleeders' are reference to a particular performance enhancing product." Aff-1, 61-62. Not only is this conclusory, it is false. Racehorses exert in training and at races and frequently have pulmonary bleeding. Treating them with "bleeders" increases capillary clotting and is routine. There is also nothing in this call about when the substances would be used in relation to a race.  Notably, while Bergen appears to have "a particular performance enhancing product" in mind, he does not specify what it is. Nor does he follow up on what it is, even after the substances were shipped and recovered by the FBI.  Consequently, the call offers nothing to suggest criminality, let alone probable cause for a wiretap.

### 2.    June 28 package

Bergen's conclusion that the substances in the June 28 package were "designed to be administered shortly before a race" has no support in fact.  Certainly, without analyzing the substances, stating the belief they are PEDs is presumptuous. But the wrong here is that in addition to being PEDs they are to be administered at times close to a race and in violation of racing regulations. The timing of the administering of the substances is the trainer's (CS-7's) responsibility, not Grasso's.  Even assuming, *arguendo*, that Grasso was responsible, there is nothing Grasso or CS-7 says in the conversation, nor is there anything about the packaging (and

certainly not the substances themselves) that indicates they should be taken at a time violative of racing regulations.

In fact, the actual packaging says in clear language across the bottom:

**Warning: all medications must be used in accordance with the rules and regulations of the racing jurisdiction of which you participate.**

See EX 2. Yet, Bergen left this out of the Affidavit.  This was a material omission. *Rivera,* supra. The government did the exact opposite of what is required here, forsaking its obligation  of candor in favor of selective disclosures and the wholesale omission of critical information. As a result, the reviewing courts were misled into authorizing the Title III intercepts.

Clearly, the warning on the label cuts to the heart of the theory of criminality.  Thus, to make the claim that the substances are "designed to be administered shortly before a race" in the face of this warning on the label and without bringing it to the court's attention was more than a material misrepresentation. It was an outright lie. In addition, the labels say that the substances should be taken hours "prior to work" and "prior to intense work," not *before a race*.  Thus, in context, and certainly with the warning, there can be no assumption that the substances are designed to be taken shortly before a race.

In any event, the labels are typed, and look professional. See EX 3a-g.

### 3.      July 22 call, July 25 package, and July 28 texts

As with the June 28 package, the Affidavit omits that the bottles in the July 25 package marked "Bronk" and "Cauterize" have the same warning labels as the ones in Box-1 about complying with racing regulations.  As discussed above, the failure of the Affidavit to raise this critical information constitutes a material omission, and, in context, a material misrepresentation that undermines the warrant application. Moreover, these labels, like before, are typed and look professional.

In addition, without knowing what the actual substances are, Bergen's contention that "'oral blood builders,' 'the breather' and the 'pain[shot]'"[12] are PEDs is a hallow statement. It is simply impossible to conclude they are banned substances. Consequently, whether the bottles looked commercially made or not (even though two of them do), is irrelevant.

As to the Epogen, the Affidavit acknowledges that it can be administered to horses in New Jersey and Florida within "24 hours of a race," and that in New York it can be used pursuant to a "valid therapeutic evidence-based treatment plan." Aff-1, 65. There is no indication that the Epogen would be used on race day, or that it would be used on horses that would be racing.[13] CS-7 stated that the horses he acquired who had blood level drops *previously* raced at Yonkers, not that they would continue to race in the near future. And of course, it is up to the trainers, not Dr. Grasso, to police when the substances should be administered. While the reference to a dog in the prescription is peculiar, this alone is insignificant fact and "under the totality of the circumstances" insufficient without more context to establish probable cause. *Gates,* supra.

Because Aff-1 failed to establish probable cause *and* it contained material misrepresentations and omissions, the September 11th Application fails. And since the October 10th Application is founded on the September 11th Application and the intercepts from it, both wiretaps fail. *See Wong Sun v. United States*, 371 U.S. 471,  484-85 (1963). Alternatively, the Court should hold a *Franks* hearing to determine the extent to which the issuing courts relied on

---

[12] Notably, insertion of the descriptor "[shot]" after the pain comes without any explanation.

[13] The text discussion about the "day of" refers to the oral blood builders, not Epogen. In the initial call on June 21, 2019 about blood builders Grasso says there won't be a "positive" (or a "stupid positive"), suggesting it is legal, especially when there is no proof provided as to what it is.

the government's misrepresentations and omissions. *United States v. Rajaratnam,* 09-Cr-1184 (RJH), 2010 WL 3219333, at *2 (S.D.N.Y. Aug. 12, 2010) (finding that the defense made a "substantial preliminary showing" that the government recklessly or knowingly omitted "several key facts" relating to necessity and ordering a *Franks* hearing).

### E.  Suppression is Warranted Because the Grasso Wiretap Application was not Focused on an Eligible Predicate Offense and the Government Failed to Demonstrate Necessity

Even assuming the Court finds probable cause and that the misrepresentations and omissions were immaterial, it should still suppress the wiretaps because the government failed to demonstrate its investigation focused on offenses other than misbranding, which is an ineligible wiretap offense, and that the extreme intrusion of privacy through eavesdropping was necessary.

Congress limited the offenses that can be the subject of a wiretap. In § 2516 of Title III, Congress "specifies that authorization for electronic surveillance may be sought only with respect to certain enumerated crimes" that might warrant tapping someone's phone. *Dalia v. United States,* 441 U.S. 238, 252 n.13 (1979). Each offense was "chosen either because it is intrinsically serious or because it is characteristic of the operations of organized crime." *Id.* at 252 n.13. Misbranding is not included among § 2516's list of eligible offenses, thus reflecting a judgment by Congress that wiretaps are not necessary or appropriate tools for investigating such a crime.

Title III permits the use of wiretaps to prosecute non-wiretap-eligible offenses only when (1) the wiretap order was "sought in good faith and not as a subterfuge search," and (2) law enforcement comes upon evidence of the ineligible offense "incidentally" in the course of intercepting communications for an authorized offense. *Rajaratnam,* 2010 WL 4867402, at *3.

Here, the applications are singly focused on misbranding. *See, e.g.*, Aff-1, 74 (discussing the apparent difficulty of finding "sources of prohibited performance-enhancing substances," clearly a reference to the alleged misbranding rather than wire fraud or mail fraud, with confidential

informants). Any way the government spins it, this fact remains. The target offense part of Aff-1 cites wire and mail fraud and money laundering (eligible offenses) and misbranding (ineligible offense) in what is essentially a string cite. Aff-1, 9.  When explaining the offenses, the Affidavit collapses them together. It says each "relat[e] to a scheme to obtain, distribute, and administer various chemical substances in order to defraud racetracks, competitors, and the betting public by placing racing horses in races after secretly administering such substances to the racing horse, as described in more detail below." Aff-1, 9.[14] But fundamentally this is misbranding, not wire or mail fraud or money laundering. And drafting it this way does not change this inescapable truth. It is not enough to merely name wire and mail fraud, and money laundering as purported target offenses to satisfy the eligible offense requirement.

Moreover, the fact that Dr. Grasso was not charged with any of the eligible offenses named in  the application, suggests that prosecutors were "uninterested" in them all along. *United   States v. Levine,* 690 F.Supp. 1165, 1171 (E.D.N.Y. 1988) ("Had the prosecutors here never used  the evidence of the state offenses set forth in the original order and never attempted to prosecute such offenses, the court might infer that they were uninterested in the state crimes and had sought the eavesdropping order only to get evidence of the federal offenses."); *contrast Masciarelli,* 558 F.2d 1067, 1069 (2d Cir. 1977) (inadvertence found, in part, because "the investigation resulted in indictments charging violations of both" enumerated and unenumerated offenses).

The apparent lack of interest in developing or pursuing the eligible offenses is further demonstrated by the history of the investigation. Dr. Grasso surfaced as a potential target after

---

[14] The second Bergen Affidavit for the renewed application contains the same string cite and language.

the Surrick and Navarro investigations had already advanced, and past the point where it was obvious that the offenses of interest were misbranding. Yet, the government still inserted the supposed eligible offense language in the Grasso applications. It's as if the language was an incantation the government knew if needed to pass muster and nothing more.

Undoubtedly, the government has never had a viable legal theory for wire fraud in Dr. Grasso's case because it cannot identify the object of the scheme—namely the money or property to which the victims (whoever they are) were entitled. *See United States v. Binday,* 804 F.3d 558, 569 (2d Cir. 2015)(wire fraud requires a scheme to defraud and money or property as the object of the  scheme). The plausibility of a money laundering investigation was even more remote. Indeed, the application was entirely devoid of evidence that Dr. Grasso was attempting to conceal proceeds of his alleged illegal activity. This leaves only the government's interest in misbranding.

Not only is misbranding not a predicate offense for a Title III intercept, but the government's elision of § 333(a)'s misdemeanor and felony provisions makes the offense's attempted use in the context of a wiretap investigation all the more troubling. In *Mitcheltree*, the Court highlighted the danger of misusing the statute in precisely this way ("We are unwilling to blur the distinction between the misdemeanor and felony provisions of § 333(a)," *Mitcheltree*, at 1351), ultimately concluding that the case before it lacked "any conscious involvement by the defendant with a government agency involved in consumer protection . . . , and . . . any link between conscious misbranding activity and a specific intent to mislead or defraud such an agency." *Id.* at 1352. Given the fact that the indictment against Dr. Grasso does not even make clear what specific agency he could have formed an intent to defraud, the government is left, at best, with misdemeanor misbranding as the baldly inadequate predicate for its Title III intercept.

27

In short, the government cannot establish that it sought the Grasso wiretap under eligible predicate offenses and thus in good faith. Therefore, the Court should suppress the wiretap and any evidence derived therefrom. Indeed, unless this Court enforces the "balance between the needs of law enforcement officials [and] the privacy rights of the individual," *United States v. Concepcion,* 579 F.3d 214, 218 (2d Cir. 2015)(internal quotation omitted), "'Title III authorization might rapidly degenerate into … 'the electronic equivalent … of a general search warrant,'" as law enforcement agents routinely  engage in "subterfuge searches." *Marion,* 535 F.2d at 701 (quoting *United States v. Brodson,* 528  F.2d 214, 215 (7th Cir. 1975).

Relatedly, the wiretaps fail for lack of necessity. 18 U.S.C. § 2518(3)(c) (requiring "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous"). Extra scrutiny should be given to this factor in light of the tenuous connection between the investigation and predicate wiretap offenses. It is the government's burden to show "that normal investigative procedures are unlikely to succeed." *Giordano,* 416 U.S. at 530.  "[C]onclusory statements" are not enough and "conclusion of others" should not be accepted at face value. *Gates,* at 239, 2333.

Here, CS-7 was obviously successful. He had Dr. Grasso's confidence and they talked freely about matters germane to the investigation.  CS-7 was cooperative and agreeable to consensual recordings which provided a window inside the alleged conspiracy akin to a wiretap, but less intrusive of course. Dr. Grasso also sent packages to CS-7 with the substances the government apparently sought.  Under the circumstances, more was clearly unnecessary and seeking a wiretap was just greedy. It was also disingenuous for Bergen to assert that "while CS-7 has successfully made purchases of performing and enhancing substances from

GRASSO, CS-7's ability to identify and contact other customers of GRASSO is limited." CS-7 obviously knew Dr. Grasso and other people Grasso knew and dealt with – "Al" for instance, the person referenced in the June 21st call, who is identified as Al Annunziata Aff-1, 58, fn. 35. Annunziata actually gave CS-7 Grasso's number. *Id.* Annunziata is a trainer and target subject noted in the Grasso application. Aff-1 at 9. Title III requires that the government to be candid about "whether or not other investigative procedures have been tried" or "why they reasonably appear unlikely to succeed if tried," 18 U.S.C. § 2518(d). It was not forthright here, Nor, is the Bergen statement, at best anything but a "generalized and conclusory statement[] that other investigative procedures would prove unsuccessful," which is insufficient. *Concepcion,* 579 F.3d at 218 (quoting *Lilla*, 699 F.2d at 104).

The other point that without eavesdropping the government would "unlikely [] be in a position to develop information regarding the sources of prohibited performance-enhancing substances beyond GRASSO himself..." makes little sense. Aff-1, 73-74. Dr. Grasso is veterinarian and under the government's theory a source. To get other sources, the investigation would go to other trainers that do not use Grasso as their veterinarian.

In addition, the assertions that other investigate techniques would be unsuccessful are mostly boilerplate and must be taken with a grain of salt.

Title III makes clear that, as a general rule, wiretaps are the last resort and should not be pursued unless absolutely necessary. There is simply a lack of showing that such was the case here. The information obtained from the wiretaps must be suppressed, or a *Franks* hearing should be held to explore, among other things, the extent of the misrepresentations and omissions in Aff-1, and the good faith and necessity of the applications. The second renewed wiretap also fails and its fruits must be suppressed because it the fruit of the poisonous tree.

*See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).

## Point III

### The Court Should Suppress the Derivative Fruits of the Wiretaps

Exploiting the illegal wiretaps, on February 20, 2020, the government obtained premise search warrants for Dr. Grasso's farm – 261 Bullville Road, Montgomery, New York – and automobile – a Mitsubishi Outlander in a combined application. Application for Search Warrant, 2/20/20, "SW App." EX 4.  The application came three and half months after the Grasso wiretaps were sealed.  The basis for probable cause in the premise warrants came exclusively from the intercepted communications from the Grasso wiretaps. SW App. 6-14.[15]

Should this Court suppress the Grasso Wiretaps, it must also suppress any evidence derived therefrom, including evidence obtained from the premise searches.  Evidence obtained as both a direct and indirect result of an unlawful search or seizure is subject to the exclusionary rule.  The critical question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  *Id*. at 488; *see also Murray v. United States,* 487 U.S. 533, 536-37 (1988) (fruit of the poisonous tree doctrine "prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an

---

[15] In the premises search warrant, it is alleged that intercepts of Grasso's phone dated back to October 2018. SW App. 6. We are not in possession of any such information that predates September 11, 2019, the date the 1st Grasso wiretap went up. We thus assume this is an error.  If not, the government should produce the pre-September 11th intercepted communications and the applications and other documents in support of the wiretaps.  And the court should give us an opportunity to challenge then and supplement the motions.

indirect result of the unlawful search.").

**Point IV**

### THE COURT SHOULD DIRECT THE GOVERNMENT TO PROVIDE ADDITIONAL DISCOVERY INCLUDING EXCULPATORY AND IMPEACHMENT MATERIAL

A criminal defendant usually cannot know if the government is withholding discoverable or exculpatory material because open file discovery is not practiced in this district.

Rule 16 of the Federal Rules of Criminal Procedure requires the government to provide a wide array of information to the defense. To the extent that these materials have not yet been provided, we ask that the government be directed to do so immediately.

In addition, and in accordance with Second Circuit policy and the practice in the Southern District of New York, all statements and reports within the meaning of the Jencks Act, 18 U.S.C. § 3500, should be provided in a timely fashion, including but not limited to the following:

> a.  Any written statement made by a witness intended to be called to testify at trial or hearing by the government that was signed or otherwise adopted or approved by the witness.  See 18 U.S.C. § 3500(e)(1).

> b.  Any stenographic, mechanical, electrical or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by such person to anyone and recorded contemporaneously with the making of such oral statement.  See 18 U.S.C. § 3500(e)(2).

> c.  The transcription of any and all Grand Jury testimony of any witness intended to be called to testify at trial or hearing by the government.  See 18 U.S.C. § 3500 (E)(3).

> d.  The notes and reports made by any governmental agent intended to testify at trial or hearing by the government which embody that agent's criminal investigation of the

31

case.

    e.  Any other statements and reports of prospective
government witnesses which have been construed by case
law to be Jencks Act material.

While the government often delays disclosure of this crucial information until the last minute, such late disclosures impede the defense's ability to prepare for trial. Consequently, violations of the right to a fair trial and to effective assistance of counsel ensue.  U.S. Const, Amends. 5, 6 and 14. To avoid these serious problems and "trial by ambush," this Court should issue an order that the government provide Jencks Act material a soon as possible and well in advance of trial.

Finally, in *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. 83, 87 (1963).  Material that is "favorable to an accused" includes not only evidence that affirmatively tends to exculpate the defendant, but also information that impeaches the credibility of the government's witnesses.  *United States v. Bagley*, 473 U.S. 667, 676-77 (1985); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).  The government's disclosure obligation includes the duty to correct false testimony that is given by government witnesses during trial.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *United States v. Agurs*, 427 U.S. 97, 103-04 (1976).  Relatedly, disclosure of favorable evidence should "be made at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case..."  *United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir.), *cert. denied*, 429 U.S. 924 (1976); *see also* Rule 5, Fed.R.Cr.P (as amended by Due Process Protections Act, effective Oct. 21, 2020).

Here, it is believed that a private company called Five Stones was hired to investigate doping in horseracing and to recruit the U.S. Attorney's Office to act on its investigation.  It is believed that the investigation was selective and not conducted fairly. It is further believed that at a point the government worked closely with Five Stones and that during the underlying investigation, investigators from Five Stones may have in essence been agents of the government.  It is also believed that evidence collection methods and witness interview techniques by Five Stone investigators may have tainted witnesses and undermined the quality of evidence. It is requested that the government be directed to provide to the defense all exculpatory and impeachment material related to Five Stones, its work on the case, and its relationship with the government.  *Kyles v. Whitley,* 514 U.S. 419, 466 (1995)(information discrediting police tactics and reliability of investigation is material under *Brady*).

Co-counsel for Richard Banca, David Cohen, made "Brady" requests of the government in regard to Five Stones and brought a motion to compel disclosures. Grasso joins in the motion.

Accordingly, all exculpatory and impeachment evidence should be immediately provided and an order should issue to this effect.

### Point V

**THIS COURT SHOULD ISSUE AN ORDER DIRECTING THE GOVERNMENT TO DISCLOSE "BAD ACT" OR "OTHER CRIMES" EVIDENCE IN ADVANCE OF TRIAL**

Rule 404 of the Federal Rules of Evidence provides that evidence relating to a defendant's other crimes, wrongs, or acts is inadmissible to show that he acted in conformity with that character on a particular occasion.  The rationale behind this rule is the notion that this evidence has minimal probative value but has the tendency to be highly prejudicial or to confuse the issues.

Prior act evidence may be admitted, however, when it is offered for a specific, legitimate purpose as proof of something other than bad character or criminal propensity. *See* FRE 404(b). Even when evidence of other acts is admitted for a permissible purpose, there is still a danger that the jury will misuse the evidence. Therefore, the use of such evidence is carefully circumscribed and limited. *United States v. Bailleaux*, 685 F.2d 1105, 1109-10 (9th Cir. 1982); *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 920 (1979); *see* Fed.R.Evid. 403. The government must also show that there is a substantial need for the evidence.  *United States v. Myers*, 550 F.2d 1036 (5th Cir. 1977).

An essential prerequisite for the admissibility of other bad act evidence is that it be relevant to prove a material issue in the case.  To be relevant, the evidence sought to be admitted must tend to make the existence of some fact that is of consequence to the determination of the action either more or less probable than it would otherwise be without the evidence. FRE 401. The government has the burden of showing how the proffered evidence is relevant to a genuine issue in the case. *United States v. Mehrmanesh*, 689 F.2d 822, 830 (9th Cir. 1982). The government must "articulate precisely the evidentiary hypothesis by which a fact of consequence may be inferred from the other acts[.]" *Id.* at 830.

In order to prepare for trial, and so as to avoid undue delay, the defense respectfully requests that the government be directed to provide "bad act" or "other crimes" evidence at the earliest possible time.

**Point VI**

**THIS COURT SHOULD ISSUE AN ORDER GRANTING
LEAVE TO DEFENDANT TO FILE ADDITIONAL AND**

34

**SUPPLEMENTAL MOTIONS AND TO JOIN IN THE
MOTIONS OF CODEFENDANTS**

In addition to the pretrial motions filed today, further motions may be necessary to preserve the defendant's rights upon receipt of the government's response to these motions, further discovery, the decisions on the motions, or after hearings.  Therefore, Dr. Grasso requests leave to file additional motions as may become appropriate if circumstances change or evolve.

Additionally, Dr. Grasso requests permission to join in the motions of codefendants to the extent that they are consistent with the interests of Dr. Grasso.  The joining of such motions is fair and just, will not tax the resources of the government, and may promote efficiency and judicial economy.

## **CONCLUSION**

For the forgoing reasons, Dr. Grasso's motions should be granted, as well as any other relief this court deems to be just and proper.

Dated:   New York, New York
      September 10, 2021

Respectfully submitted,

_____
GLENN A. GARBER

GLENN A. GARBER, P.C.
Attorney for Louis Grasso

The Woolworth Building
233 Broadway, Suite 2370
New York, NY 10279
(212) 965-9370